UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA

v.                                              CASE NO: 2:15-cr-106-FtM-38MRM

RONALD R. RAIOLA

_____/

### REPORT AND RECOMMENDATION[1]

This cause comes before the Court on Defendant Ronald R. Raiola's Motion to

Determine Competency and for a Hearing (Doc. 68) filed on May 4, 2016.

### PROCEDURAL BACKGROUND

On February 11 and February 13, 2016, Dr. Robert Ouaou, a neuropsychologist,

conducted an examination of Defendant. (Doc. 68 at 1 ¶ 5). Based on the examination, Dr.

Ouaou opined that Defendant lacks competency to proceed in this case. (*Id.* at 2 ¶ 6). Defendant

filed his Motion to Determine Competency and for a Hearing (Doc. 68) on May 4, 2016.

On May 12, 2016, the Court conducted a status hearing regarding Defendant's Motion

(Doc. 68). At the May 12 status hearing, the Court addressed the status of Defendant's motion,

including Defendant's request to have any court-ordered evaluation be conducted locally on an

outpatient basis. (*See* Doc. 78 at 1). At the conclusion of the status hearing, the Court ordered

---

[1] Disclaimer: Documents filed in CM/ECF may contain hyperlinks to other documents or
websites. These hyperlinks are provided only for users' convenience. Users are cautioned that
hyperlinked documents in CM/ECF are subject to PACER fees. By allowing hyperlinks to other
websites, this Court does not endorse, recommend, approve, or guarantee any third parties or the
services or products they provide on their websites. Likewise, the Court has no agreements with
any of these third parties or their websites. The Court accepts no responsibility for the
availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or
directs the user to some other site does not affect the opinion of the Court.

the Government to determine "whether the Bureau of Prisons is able and willing to conduct an evaluation of Defendant Raiola on an outpatient basis" and scheduled a follow-up hearing.  (*Id.*).

On June 3, 2016, the Court conducted the follow-up status hearing on Defendant's Motion (Doc. 68).  The Government advised that the Bureau of Prisons does not perform evaluations on an outpatient basis.  The Court, therefore, ordered the United States to identify a qualified evaluator within the Fort Myers Division of the Middle District of Florida for the purpose of evaluating Defendant's competency.  (Doc. 82 at 1).  The Court ordered the United States to file a Notice of Filing identifying its proposed evaluator and attaching his or her *curriculum vitae* for the Court's consideration.  (*Id.*).

On June 10, 2016, the United States filed a Notice of Filing (Doc. 83) requesting that the Court appoint Dr. Keegan R. Culver, Psy.D., located in Fort Myers, Florida, for the purpose of evaluating Defendant Raiola's competency on an outpatient basis.  (Doc. 83 at 1).  After review, the Court found that there was reasonable cause to believe that Defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense pursuant to 18 U.S.C. §§ 4241 and 4247.  (Doc. 84 at 2).  Thus, the Court granted Defendant's Motion to Determine Competency and for a Hearing (Doc. 68) and appointed Dr. Culver to conduct a psychiatric or psychological examination of Defendant on an outpatient, noncustodial basis at Dr. Culver's office or other location designated by Dr. Culver. (Doc. 84 at 3).  The Court also ordered Dr. Culver to prepare a psychiatric or psychological report pursuant Sections 4247(b) and (c).  (*Id.*).

Defendant appeared for an evaluation at Dr. Culver's office on July 12, 2016.  After Dr. Culver completed her report, the Court initially scheduled a competency hearing for September

27, 2016.  Later, the Court granted the Government's Unopposed Motion to Continue

Competency Hearing and rescheduled the competency hearing to October 19, 2016.  A

competency hearing was held on October 19-20, 2016.  Dr. Ouaou and Dr. Culver testified at the

hearing.  Defendant was present at the hearing.  Additionally, counsel gave oral argument at the

conclusion of the testimony.  The matter is ripe for consideration.  Based on the testimony of the

experts at the hearing and the information contained in the experts' reports, the Undersigned

finds that Defendant is competent and that the case should proceed to trial.

## LEGAL STANDARD

The federal competency standard is set forth in 18 U.S.C. § 4241.  The statute provides:

> If after the hearing, the court finds by a preponderance of the evidence that the
> defendant is presently suffering from a mental disease or defect rendering him
> mentally incompetent to the extent that he is unable to understand the nature and
> consequences of the proceedings against him or to assist properly in his defense,
> the court shall commit the defendant to the custody of the Attorney General.

18 U.S.C. § 4241(d).  The standard to determine mental competency to stand trial "is whether the

defendant ha[s] 'sufficient present ability to consult with his lawyer with a reasonable degree of

rational understanding' and whether he ha[s] 'a rational as well as factual understanding of the

proceedings against him.'"  *United States v. Nickels*, 324 F.3d 1250, 1252 (11th Cir. 2003)

(citing *United States v. Cruz*, 805 F.2d 1464, 1479 (11th Cir. 1986) (quoting *Dusky v. United

States*, 362 U.S. 402 (1960))).  Accordingly, to be mentally incompetent to stand trial, Defendant

must suffer from a mental disease or defect such that he is unable (1) to understand the nature

and consequences of the proceedings against him or (2) to assist properly in his defense.  18

U.S.C. § 4241(d).  The Undersigned evaluates the issues below.

## DEFENDANT'S COMPETENCY

### I.   Ability to Understand the Nature and Consequences of the Proceedings

The first issue is whether Defendant maintains the ability to understand the nature and consequences of the proceedings against him.

On this issue, both experts agree that Defendant can adequately understand the nature and consequences of the proceedings against him.  Dr. Ouaou opined in his report that Defendant "understands the adversarial nature of the legal process and the roles of a jury or attorney." (Defendant's Exhibit B, filed under seal at Doc. 77 at 8-9).  Similarly, Dr. Culver opined in her report that Defendant "demonstrated an adequate appreciation of the nature of the proceedings against him" and that Defendant demonstrated "an adequate appreciation of the possible penalties he faces."  (Government's Exhibit 2, filed under seal at Doc. 125 at 13-14).  Further, Dr. Culver wrote that Defendant "was able to communicate an adequate understanding of the roles and functions of the major participants in a trial and the adversarial nature of the legal process" and that Defendant "showed an ability to enhance his understanding about a legal concept through deductive reasoning."  (*Id.* at 14-15).

Furthermore, Defendant does not dispute that "he understands the nature and the consequences of the proceeding." (Doc. 122 at 3:14-15).  Defendant's counsel stated in closing argument at the competency hearing that this was "not an issue in this case."  (*Id.* at 3:15-16). Moreover, the Government stated that "there does not appear to be any controversy here" with respect to this prong of the *Dusky* standard.  (*Id.* at 25:1-3).  The Government specifically noted that the parties agreed that Defendant understands the nature and the consequences of the proceedings against him.  (*Id.* at 25:4-5).

Because the parties and the experts agree on this point, the Undersigned finds that Defendant does not have a mental disease or defect that inhibits his ability to adequately understand the nature and consequences of the proceedings against him.

## II.   Ability to Properly Assist in His Own Defense

The Court next addresses whether Defendant has a mental disease or defect that renders him unable to assist properly in his defense.  *See* 18 U.S.C. § 4241(d).  On this issue, the parties disagree.  To evaluate this issue, the Court discusses the relevant portions of (A) the expert reports, (B) the expert testimony, and (C) closing argument by counsel.

### A.  Expert Reports

#### i.  Dr. Ouaou's Report

Dr. Ouaou conducted an examination of Defendant on February 11 and 13, 2016 at his office "in a private exam room that was free from visual or auditory distractions." (Doc. 77 at 1).  Dr. Ouaou reviewed medical records and conducted neuropsychological tests.  (*Id.*).

In his report, Dr. Ouaou discussed Defendant's relevant history.  (*Id.*).  Dr. Ouaou noted that Mr. Raiola was "quite tangential and had difficulties following directions, finding words, and focusing throughout our testing sessions."  (*Id.*).  Dr. Ouaou further noted that Defendant "had difficulties providing exact dates and details related to his charges, stating that he has problems with attention, concentration, and memory."  (*Id.*).

As to Defendant's current mental status, Dr. Ouaou wrote that Defendant "has frank impairments in attention and concentration."  (*Id.* at 2).  Specifically, Dr. Ouaou described Defendant as tangential, circumstantial, and intermittently confused with significant difficulties staying on task.  (*Id.*).  Dr. Ouaou noted that a Defendant's mood was depressed and anxious.

(*Id.*).  Moreover, Dr. Ouaou wrote that many procedures required "multiple explanations secondary to his difficulties maintaining attention and apparent comprehension defects."  (*Id.*).

Dr. Ouaou next discussed Defendant's medications and past medical history.  (*Id.*).  Dr. Ouaou noted a history of "hypertension, hyperlipidemia, convulsive epilepsy secondary to traumatic brain injury, esophageal reflux, and osteoarthritis."  (*Id.*).  Dr. Ouaou noted that Defendant reportedly "suffered a severe traumatic brain injury as a child of 2.5 years old."  (*Id.*).  Defendant reported being hospitalized and undergoing neurosurgery.  (*Id.*).  Defendant further reported being unconscious for thirty days and being paralyzed for nine months with significant neurotrauma.  (*Id.*).  Defendant reported that "he underwent many years of therapies and does not recall anything until age 6 or 7."  (*Id.*).  Defendant reported that "[a]s a result of the traumatic brain injury he was clumsy, slow, easily confused, and had speech problems."  (*Id.*).  Defendant also reported being prescribed anti-seizure medications since childhood and receiving Social Security Disability.  (*Id.*).  A review of imaging from 2005, 2008, and 2010 "showed right parietal craniotomy with subjacent frontoparietal atrophy related to old contusion."  (*Id.*).  Dr. Ouaou wrote that Defendant treats with a neurologist, Dr. Steimetz.  (*Id.*).  Defendant further reported "seizures, headaches, panic attacks, and cognitive problems all of his life."  (*Id.*).  Defendant denied any history of other head injuries, strokes, or other neurological disease.  (*Id.*).  Dr. Ouaou noted that Mr. Raiola's past psychiatric history included panic attacks, anxiety, and depression but no history of drug or alcohol abuse or treatment.  (*Id.* at 3).

Dr. Ouaou's report next discussed the battery of neuropsychological tests administered.  (*Id.* at 3-8).  On those tests, Dr. Ouaou found that the evaluation could be "considered to be a valid profile of the examinee's neuropsychological functioning."  (*Id.* at 3).  Specifically, Dr.

Ouaou noted that, on multiple tests of effort and motivation, Defendant performed within normal limits. (*Id.*). Thus, Dr. Ouaou did not find Defendant to be malingering. (*See id.*).

In addition to testing for malingering, the testing examined Defendant's intellectual functioning, cognitive functions, and learning/memory. (*See id.* at 3-8).

First, as to intellectual functioning, Defendant was administered a verbal reading test (the TOPF) "designed to estimate an individual's intellectual ability prior to any type of neurological disease or insult." (*Id.* at 4). On this test, Defendant scored in the low average range. (*Id.*). Dr. Ouaou also administered the Wechsler Adult Intelligence Scale - Fourth Edition ("WAIS-IV"). (*Id.* at 5). Defendant's general cognitive ability score was in the low average range of intellectual functioning above approximately 12% of adults his age. (*Id.*). Defendant's verbal comprehension score – a measure of acquired knowledge, verbal reasoning, and comprehension of verbal information – was in the low average range above approximately 23% of peers. (*Id.*). Defendant's perceptual reasoning score – an indication of an individual's nonverbal reasoning, spatial processing skills, attentiveness to detail, and visual-motor integration – was also in the low average above approximately 21% of Defendant's peers. (*Id.*).

Dr. Ouaou next discussed the testing as to Defendant's cognitive functions, specifically Defendant's attention and concentration. (*Id.*).

As to Defendant's immediate memory span, Dr. Ouaou noted that Defendant "demonstrated impaired performance on measures of immediate memory." (*Id.*). Specifically, Defendant "was able to repeat up to 6 digits forward on the WAIS-IV Digit Span, which is in the average range," but Defendant's recall of the initial list of words from the California Verbal Learning Test-2nd Edition ("CVLT-II") was in the low average range relative to age-matched peers. (*Id.*). Defendant's recall of a second interference list was in the impaired range. (*Id.*).

As to focused and flexible attention – a measure of the completion time for a task requiring motor speed, sequencing, and visual search – Defendant scored in the mildly impaired range.  (*Id.*).  When the task was made more complex by requiring that he alternate cognitive sets, Defendant performed within the low average range.  (*Id.*).

As to processing speed – a measure of ability to quickly and correctly scan, sequence, or discriminate simple visual information and also a measure of short-term visual memory, attention, and visual-motor coordination – Defendant scored in the first percentile, better than only 1% of his peers.  (*Id.*).

For working memory – a measure of an individual's ability to hold information temporarily in memory for the purpose of using that information to perform a specific task – Defendant scored in the average range above 50% of his age matched peers.  (*Id.*).  Dr. Ouaou noted that Defendant "was able to repeat a maximum of 3 digits backwards, which is in impaired range relative to age-matched peers."  (*Id.*).

The report's final section discussed the testing results for learning and memory.  (*Id.* at 6-8).  This section includes the ability to acquire new information; recall; recognition; language; spatial analysis and synthesis; and reasoning, problem solving, and executive function.  (*Id.*).

As to acquisition of new information, Defendant scored in the low average range compared to age matched peers for total list learning on the CVLT-II.  (*Id.* at 6).  Defendant "was able to learn 7 words after 5 trials, which is in the mildly impaired range (7th percentile)."  (*Id.*).  For figure learning on the Wechsler Memory Scale - Forth Edition ("WMS-IV") test, Defendant scored in the low average range at the 16th percentile relative to age matched peers.  (*Id.*).  Finally, for story learning on the WMS-IV, Defendant scored in the low average range at the 25th percentile relative to age matched peers.  (*Id.*).

As to recall, Defendant's score for word-list recall following a brief delay and presentation of a second interference list was in the moderately impaired range at the 2nd percentile.  (*Id.*).  Defendant scored in the low average range for short-delayed cued recall.  (*Id.*).  For long-delayed recall, Defendant recalled five words, placing him in the impaired range at the 7th percentile.  (*Id.*).  Dr. Ouaou noted that figure recall from the WMS-IV placed Defendant in the moderately impaired range at the 2nd percentile.  (*Id.*).  Defendant's story recall from the WMS-IV test was in the mildly impaired range at the 9th percentile.  (*Id.*).  Finally, Defendant's incidental recall of a complex geometric figure placed Defendant in the mildly impaired ranges for short and delayed recall at the 10th and 12th percentiles.  (*Id.*).

As to recognition, Defendant scored in the impaired range for word-list recognition on the CVLT-II and the WMS-IV.  (*Id.*).  Dr. Ouaou reported that Defendant "was unable to adequately discriminate between learned and non-learned information."  (*Id.*).

As to Defendant's scores for language testing, Defendant scored in the low average range for verbal comprehension on the WAIS-IV at the 23rd percentile.  (*Id.* at 7).  The semantic verbal fluency score was in the mildly impaired range at the 9th percentile.  (*Id.*).  The score for lexical verbal fluency was in the moderately impaired range at the 1st percentile.  (*Id.*).

As to spatial analysis and synthesis, Defendant's score on the WAIS-IV Block Design test was in the low average range at the 15th percentile.  (*Id.*).  Matrix reasoning results from the WAIS-IV were in the low average range at the 16th percentile.  (*Id.*).  Finally, Defendant's score for "visuospatial praxis on the Rey Complex Figure" was within normal limits.  (*Id.*).

As to Defendant's score for reasoning, problem solving, and executive function, Dr. Ouaou wrote that Defendant scored within the low average range at the 25th percentile for a

measure of verbal reasoning and abstraction called "similarities."  (*Id.* at 8).[2]  Dr. Ouaou noted

that Defendant's scores on subtests of the Delis Kaplan Executive Function System test were

relatively intact.  (*Id.*).

In sum, Dr. Ouaou opined that the testing showed Defendant "put forth maximum effort

on measures associated with malingering or feigning cognitive impairment."  (*Id.*).  Dr. Ouaou

noted that Defendant "passed all indicators that he was giving genuine effort and the results are

considered to be a valid and comprehensive summary of his intellectual and cognitive

functioning."  (*Id.*).  Dr. Ouaou opined that the testing showed that Defendant "exhibited

cognitive deficits that are found in patients with acquired neurological injury or disease" and that

Defendant "demonstrated learning and memory deficits."  (*Id.*).  Dr. Ouaou noted that Defendant

"has severely impaired deficits in processing speed" and "difficulty with verbal fluency and

word finding."  (*Id.*).

Based on his examination, Dr. Ouaou opined that Defendant has "signs of acquired brain

damage related to traumatic brain injury from childhood."  (*Id.*).  Dr. Ouaou wrote that "Mr.

Raiola exhibited cognitive deficits and reported symptoms that are found in patients with brain

damage."  (*Id.*).  Dr. Ouaou wrote that these "cognitive deficits are significant and related to

---

[2] Dr. Ouaou explained:

> Executive functions are those neuropsychological processes that allow an individual to plan, initiate, program, sequence, and maintain goal-directed behavior, especially under novel circumstances.  These complex cognitive functions also allow an individual insight into the intent of their behavior.

> Executive functions allow an individual to alter her/his behavior in order to meet the demands of a task or inhibit nonproductive behavior.  Executive functions are affected by global traumatic brain injury as well as focal injuries to the frontal lobes of the brain.

(Doc. 77 at 7-8).

language, learning, memory, and processing speed." (*Id.*).  Dr. Ouaou diagnosed Defendant with "Major Neurocognitive Disorder secondary to childhood Traumatic Brain Injury." (*Id.*).

In conclusion, Dr. Ouaou opined that Defendant's "significant cognitive and psychiatric defects beginning in childhood" affect his current competency. (*Id.* at 9).  Dr. Ouaou opined that "[a]lthough [Defendant] understands the adversarial nature of the legal process and the roles of a jury or attorney, he has impaired present ability to consult with his lawyer and assist in preparing his defense." (*Id.*).  Dr. Ouaou stated that Defendant's "abilities to disclose to his attorney facts pertinent to the proceedings and testify relevantly are likely impaired, as is his ability to follow courtroom proceedings secondary to impaired learning, memory, word finding, and speed of mental processing." (*Id.*).  Accordingly, Dr. Ouaou opined that "with an adequate degree of psychological certainty that Ronald Raiola likely lacks the capacity to proceed." (*Id.*).  Dr. Ouaou wrote that "[t]he etiologies of the mental defects are delineated above and it is questionable whether his lack of competency is reversible." (*Id.*).  Dr. Ouaou stated that his opinions were given with a reasonable degree of neuropsychological certainty. (*Id.*).

### ii. Dr. Culver's Report

Dr. Culver examined Defendant on July 12, 2016 at her office in Fort Myers, Florida. (Doc. 125 at 2).  The evaluation lasted four hours. (*Id.*).  Defendant was forensically interviewed and psychological testing was administered. (*Id.*).  Dr. Culver conducted the evaluation and prepared the written report, but Dr. Culver's postdoctoral resident, Dr. Casey Dawson, observed the forensic interview and administered the psychological testing with Dr. Culver's observation and supervision from the same room. (*Id.*).

In her report, Dr. Culver noted behavioral observations and mental status. (*Id.*).  Dr. Culver reported that Defendant "arrived early for his appointment and he arrived

unaccompanied." (*Id.*). Defendant reportedly drove himself to the appointment and had no difficulty filling out the initial paperwork independently. (*Id.*). Defendant was dressed casually and showed proper grooming and hygiene. (*Id.*). Dr. Culver noted that Defendant spoke with a lisp and that Defendant's speech was halting and lacked a fluid rhythm. (*Id.* at 3). Dr. Culver "suspected that this speech style was adopted as a means of appearing 'slow.'" (*Id.*).

Dr. Culver noted that Defendant was fully oriented to person, place, time and event. (*Id.*). Dr. Culver wrote that Defendant was a good historian and that Defendant "showed no significant problems relating a detailed personal history." (*Id.*). Dr. Culver reported that Defendant "consistently demonstrated grossly intact short-term and long-term memory throughout the course of this evaluation." (*Id.*). At one point, Defendant "recalled that his wife had an appointment today and he asked about the length of the present evaluation in order to plan for her transportation later on." (*Id.*). Dr. Culver stated that these actions suggested intact foresight and preplanning. (*Id.*). Moreover, Dr. Culver opined that Defendant "demonstrated an ability to control his disclosures." (*Id.*).

Dr. Culver noted that Defendant's mood was normal and that he demonstrated a full range of appropriate affect. (*Id.*). Moreover, while Defendant sometimes veered off topic, Dr. Culver noted that Defendant could be redirected, which showed that Defendant has "adequate focus and concentration and no significant lapses in attention." (*Id.*). Dr. Culver reported that Defendant was "superficially cooperative with the evaluation" but that Defendant demonstrated "rather dramatic behavior during memory testing," which raised concerns about the validity of his presentation. (*Id.*). Dr. Culver reported that "[t]he administration of these types of tests does not usually bring about such dramatizations from the test taker." (*Id.* at 4).

Dr. Culver reported that Defendant's thought process was relevant and coherent and that his thinking did not appear disordered.  (*Id.*).  In fact, Dr. Culver opined that "while [Defendant] claimed to be un-educated and not very intelligent, the quality of his verbal communication and demonstrated reasoning abilities suggested average-range intellectual functioning."  (*Id.*).  Dr. Culver noted that "[t]his was one of many inconsistencies observed during the present evaluation pertaining to Mr. Raiola's claims versus his demonstrated ability."  (*Id.*).

Dr. Culver wrote that Defendant also demonstrated "an ability to engage in deductive reasoning, as well as an ability to think hypothetically."  (*Id.*).  Moreover, Dr. Culver wrote that Defendant was able to discuss hypothetical legal scenarios.  (*Id.*).  Dr. Culver stated that "[d]eductive reasoning, abstract/hypothetical reasoning, and conceptual reasoning are upper-level cognitive abilities which many adults never succeed in attaining or developing."  (*Id.*).  Dr. Culver stated that "while Mr. Raiola claimed to be an unsophisticated individual, his demonstrated cognitive abilities belied this notion."  (*Id.*).  Dr. Culver wrote that "Mr. Raiola did not evidence impaired processing abilities within the context of the present face-to-face interview" and that "the quality and content of his humorous banter with the evaluators showed a 'quickness' to his thinking that belied impaired mental processing speed."  (*Id.*).  Dr. Culver opined that "[w]hile it may certainly be the case that Mr. Raiola processes information somewhat slowly, his mental processing abilities are not so impaired as to interfere with his ability to communicate information, to quickly catch and correct mistakes, or to read and complete paperwork in a timely fashion."  (*Id.*).

Dr. Culver also interviewed Defendant regarding his personal history, family history, educational history, occupational history, and psychological history.  Defendant reported a childhood brain injury that "caused him to suffer seizures, coordination problems, headaches,

memory loss, learning difficulties, speech difficulties, and low intellectual functioning, all of which have worsened over time." (*Id.* at 5). Defendant "denied ever having been treated for anxiety or depression." (*Id.* at 6). Records showed, however, that "Mr. Raiola was indeed treated for anxiety with Xanax." (*Id.*).

Dr. Culver also noted that "there was little evidence in his medical record to substantiate the presence of epileptic seizures." (*Id.*). In fact, Dr. Culver wrote that "Mr. Raiola's brain injury and purported seizure activity is not located in an area normally associated with 'memory loss,' as he claims to be experiencing. This is mostly common among individuals suffering from temporal lobe epilepsy." (*Id.* at 7). Defendant reported that his seizures did not affect his driving; that he never had a seizure while driving; and that he has never been involved a motor vehicle accident while driving. (*Id.* at 8). Defendant "denied ever having had his license cancelled, suspended, or revoked due to seizures." (*Id.*). Dr. Culver noted that because "clinicians are authorized to report to the Department of Highway Safety and Motor Vehicles any patient with a disabling condition that interferes with safe operation of a vehicle," it appears that Defendant's "treating physicians have had concerns about his seizures or any other brain-based problem interfering with his driving." (*Id.*). Additionally, Dr. Culver wrote that Defendant's medical records indicated that Defendant's "seizures" might be better explained as anxiety attacks. (*Id.* at 9).

Moreover, Dr. Culver wrote that "driving without getting lost or disoriented strongly suggests that he is possesses grossly intact processing speed abilities and memory abilities." (*Id.* at 8). Dr. Culver stated that "[s]afe operation of a motor vehicle is a complex activity that requires the use of a variety of cognitive skills at once, including divided attention, visual acuity, spatial perception, judgment, speedy reaction time (i.e. mental processing), and working memory

(holding things in mind while operating on that information)." (*Id.* at 8-9). Dr. Culver opined

that Defendant's neurological records revealed grossly intact neurological functioning. (*Id.* at 9).

Dr. Culver also discussed Defendant's daily functioning. (*Id.* at 6). Defendant reported

spending most of his time watching television. (*Id.*). Nonetheless, Defendant reported that he is

able to cook. (*Id.*). Dr. Culver wrote that cooking "requires decent memory, planning,

sequencing, and functional academic skills. Indeed, many individuals with Dementia cannot

cook due to impairments in these abilities." (*Id.*).

Dr. Culver also reviewed audio recordings from a Social Security Administration hearing

in 2012. (*Id.* at 10). Dr. Culver noted "obvious and significant" discrepancies between her

evaluation and Defendant's speech during the Social Security hearing. (*Id.*). Unlike her

competency evaluation, Dr. Culver noted that Defendant's speech during the hearing was "clear,

fluid, and relatively rapid" and "did not contain pauses or choppy prosody as was seen during the

present evaluation." (*Id.*). Further, Dr. Culver noted that "[t]he speed with which he processed

information, spoke, provided responses, and corrected statements would suggest grossly intact

processing speed abilities." (*Id.*).

Dr. Culver also reviewed Dr. Ouaou's report. (*Id.* at 11). In pertinent part, Dr. Culver

noted that Defendant's working memory was in the average range, indicating normal ability to

hold and manipulate information in short-term memory. (*Id.*). Additionally, Dr. Culver noted

that while Defendant obtained a processing speed score in the extremely low range, Defendant

did not present with functional impairments in terms of processing speed at her evaluation. (*Id.*).

Dr. Culver specifically noted that Defendant "drives, engages in humorous banter, catches and

corrects others' inaccurate statements, interjects, and can provide quick responses to questions."

(*Id.*). Further, while Defendant "may have obtained scores that indicated impaired memory

abilities," Dr. Culver wrote that Defendant "does not evidence significant functional memory impairments." (*Id.*). Dr. Culver, however, did not contest the validity of Defendant's scores. (*Id.*).

Dr. Culver's report next discussed the results of the psychological testing. (*Id.* at 12). Defendant was administered the Personality Assessment Inventory ("PAI") and the Green's Word Memory Test ("WMT"). (*Id.*).

The PAI is a personality test taken by paper and pencil in which a person reads a statement and then circles a corresponding response indicating to what extent they agree or disagree with the statement test. (*Id.*). On this test, Dr. Culver reported that "Mr. Raiola read the items without apparent difficulty and he completed this test in an average amount of time. Thus, on this measure he did not evidence significantly impaired processing speed." (*Id.*). Dr. Culver noted that "[t]he PAI is widely used personality test that assesses a person's psychological adjustment to the degree they report various maladaptive behaviors and problems functioning" and that the test "contains validity scales aimed at detecting under- or over-reporting of problems, carelessness, reading difficulties, and confusion." (*Id.*). Dr. Culver noted that "Mr. Raiola attended appropriately to the questions and he responded consistently suggesting no problems with reading, carelessness, or confusion" but that he "was not completely forthright in his approach to the test questions." (*Id.*). Dr. Culver reported that Defendant "attempted to portray himself as a highly virtuous individual," which likely invalidated the test. (*Id.*).

On the WMT – a verbal memory test that contains hidden measures to check the validity of the respondent's test scores – Dr. Culver wrote that "Mr. Raiola's test results could be considered valid since he did not perform worse than chance guessing," but "[i]f this is a valid performance, which it could be, then Mr. Raiola's profile is consistent with advanced (severe)

dementia." (*Id.*). Dr. Culver noted that Defendant performed worse than individuals who are hospitalized due to advanced dementia, individuals who are intentionally faking memory impairment, individuals with Intellectual Disability, and significantly worse than individuals with moderate to severe brain injuries. (*Id.*). As a result, Dr. Culver wrote that the scores did not align with what is known about Defendant's functional abilities. (*Id.*). Dr. Culver opined that if Defendant's scores are representative of his genuine abilities, then his family likely needs to pursue institutionalization. (*Id.*).

After discussing the testing, Dr. Culver gave an assessment of Defendant's competency. (*Id.* at 12-16). As to Defendant's ability to assist in his own defense, Dr. Culver reported that Defendant "was able to relate detailed information about his version of events and his depiction did not appear to contain deluded elements." (*Id.* at 13). Dr. Culver opined that Defendant "showed an ability to enhance his understanding about a legal concept through deductive reasoning." (*Id.* at 15).

Further, Dr. Culver opined that Defendant "demonstrated an ability to consult with his lawyer and to aid in his own defense." (*Id.* at 15). Specifically, Dr. Culver wrote that Defendant "evidenced an awareness that his lawyer's role is to defend his legal rights." (*Id.*). Additionally, Dr. Culver wrote that "[d]uring the present evaluation Mr. Raiola was able to relate information that might be deemed relevant to his defense." (*Id.*). In fact, Dr. Culver stated that Defendant "was able to provide detailed autobiographical reports including a basic outline of the events that led to his indictment" and that Defendant's "depiction of what transpired surrounding his arrest did not appear to contain delusional elements." (*Id.*).

Additionally, Dr. Culver opined that Defendant "showed that he has the ability to testify relevantly on his own behalf, in the event he chooses to do so." (*Id.* at 16). Dr. Culver noted that

Defendant's memory was good enough to be able to remember that his attorney writes things down for him and also good enough to remember where Defendant keeps those notes.  (*Id.*).  Dr. Culver reported Defendant to be quite talkative and at times tangential but with responses that were relevant and coherent.  (*Id.*).  Moreover, Dr. Culver specifically noted that Defendant "could be fairly easily redirected to the topic at hand," meaning that Defendant's "tangentiality is [not] due to a disordered thinking (i.e. psychosis) or due to brain-based impairment."  (*Id.*).  Dr. Culver reported that Defendant "showed an ability to control his disclosures suggesting he would be able to avoid self-incrimination" and that "audio recordings of his prior hearings showed that he was able to testify relevantly in those instances."  (*Id.*).

In conclusion, Dr. Culver opined that her evaluation supports a finding for competence to proceed.  (*Id.*).  Dr. Culver wrote that "[w]hile it is recognized that Mr. Raiola suffered from a brain injury as a toddler, he evidences few, if any, functional impairments from this injury as an adult."  (*Id.*).  Dr. Culver further wrote that "[i]t is important to note, that brain injuries are static, fixed conditions" and that Defendant "has been living with and functioning with his brain injury for over 50 years."  (*Id.*).  Moreover, while Defendant's testing scores were indicative of effort, Dr. Culver wrote that his performances on the testing "did not match up with his demonstrated functional abilities."  (*Id.* at 17).  Thus, Dr. Culver wrote that Defendant's present symptoms are not believed to "presently compromise Mr. Raiola's thinking, reasoning, or decision-making to a sufficient degree as to render him legally incompetent."  (*Id.*).

### B.  Expert Testimony

#### i.  *Dr. Ouaou's Testimony*

Dr. Ouaou testified first at the competency hearing.  (Doc. 121 at 10).  After discussing his *curriculum vitae*, including past educational and work experiences, Dr. Ouaou was qualified

as an expert in the field of "neuropsychology and clinical psychology." (*Id.* at 16:14-15). Dr. Ouaou was then questioned about his examination of Defendant and his report. (*Id.* at 16-17).

Dr. Ouaou testified that he conducted a neuropsychological evaluation due to the report that Defendant suffered a traumatic brain injury. (*Id.* at 17). Specifically, Dr. Ouaou testified that Defendant could be suffering from cognitive deficits or neurocognitive deficits relating to a brain injury that continue to the present time and that affect his ability to assist counsel. (*Id.* at 18:6-10). Dr. Ouaou testified that a neuropsychological evaluation focuses on "the cognitive abilities of a client who may have sustained a neurologic injury" while a traditional psychological evaluation is more interested in psychopathology. (*Id.* at 21).

Dr. Ouaou testified that the evaluation was conducted on two different days and lasted eight hours in total. (*Id.* at 18-19). Dr. Ouaou testified that he administered "a comprehensive neuropsychological test battery." (*Id.* at 18:17-18). Dr. Ouaou testified that Defendant took plenty of breaks. (*Id.* at 18:25). Dr. Ouaou stated that the testing consisted of standardized tests compared against a normative sample that took the same test the same way. (*Id.* at 19:18-22). Dr. Ouaou stated that the testing was conducted at his office with only Defendant and Dr. Ouaou present. (*Id.* at 21:3-4). Dr. Ouaou stated that all testing was objective. (*Id.* at 21:25). Dr. Ouaou testified that there was no indication of malingering and that the testing confirmed that Defendant was giving his maximum effort. (*Id.* at 23-24).

The testing evaluated different areas of Defendant's cognitive function. (*Id.* at 24:9). For instance, Dr. Ouaou noted that Defendant had low average IQ. (*Id.* at 25:1). Further, Dr. Ouaou testified that Defendant had severely impaired processing speed—a measure of visual motor coordination task that integrates attention and short-term memory. (*Id.* at 25:20-25). Dr. Ouaou testified that Defendant "has difficulty integrating information that occurs too rapidly for him"

and that his score was at the first percentile, meaning that 99 percent of people in his age range score better.  (*Id.* at 25:18-25).  Moreover, Dr. Ouaou testified that Defendant demonstrated "a pretty well defined pattern of memory processing speed and some language defects that were significant."  (*Id.* at 26:6-8).  Nonetheless, Dr. Ouaou testified that Defendant scored within normal ranges on areas such as executive functions, working memory, and concentration, indicating that Defendant did not have significant impairments across the board.  (*Id.* at 26:1-5).  Dr. Ouaou testified that Defendant's results were consistent with a "traumatic brain injury as a child, which has become progressively worse over the years."  (*Id.* at 33:14-16).  Dr. Ouaou testified that Defendant's impairments are cumulative.  (*Id.* at 29:23).

Dr. Ouaou testified that Defendant's deficits would affect an individual in a criminal trial.  (*Id.* at 35:12-13).  In particular, due to the "enormous amount of discovery" in this case, Dr. Ouaou testified that he thought it would be nearly impossible for Defendant to follow the information being presented.  (*Id.* at 35:19-21).  Dr. Ouaou specifically pointed out that Defendant's impairments on processing speed impede his ability to digest the information being presented.  (*Id.* at 36).  Dr. Ouaou testified that he believed that Defendant would have an adequate ability to review and evaluate one or two documents and other evidence relating to the case but that Defendant would have "real difficulty" with multiple documents.  (*Id.* at 46:16-21).  Dr. Ouaou testified that Defendant does not have present ability to disclose pertinent facts to his attorney in this case or to testify relevantly.  (*Id.* at 37-38).  Moreover, Dr. Ouaou testified that Defendant's anxiety only makes his problems worse.  (*Id.* at 39:12).  Dr. Ouaou also testified that the testing that Dr. Culver administered did not address neuropsychology but instead addressed malingering and psychopathology.  (*Id.* at 41-42).

On cross-examination, Dr. Ouaou conceded that he had not seen any medical records that actually established that Defendant suffered a traumatic brain injury during childhood.  (*Id.* at 52).  Nevertheless, Dr. Ouaou stated that there was evidence that Defendant underwent a craniotomy procedure.  (*Id.* at 55).

Dr. Ouaou also testified that Defendant drove to his office, unaccompanied on the two testing dates.  (*Id.* at 59).  Dr. Ouaou stated that Defendant was directed to return in two days after the first appointment and that Defendant did so as directed.  (*Id.* at 60:19-23).  Further, Dr. Ouaou stated that Defendant showed an ability to control his responses and that Defendant could speed up his responses.  (*Id.* at 61).  Dr. Ouaou also testified that Defendant filled out paperwork when he arrived at his office.  (*Id.* at 65).  Dr. Ouaou testified that Defendant had never seen the documents before he completed the forms.  (*Id.* at 65-66).  Dr. Ouaou testified that he believed Mr. Raiola understood all of the forms because he would not have treated Defendant if he could not understand them.  (*Id.* at 66:17-23).

Dr. Ouaou conceded that he did not administer any adaptive functioning testing that measures day-to-day functioning.  (*Id.* at 69:16-20).  Additionally, Dr. Ouaou conceded that Defendant an IQ of 82 "by itself is not an indicator of competency or lack of competency here" and that Defendant "could hold a job with that IQ."  (*Id.* at 71).

Dr. Ouaou testified that Defendant "tended to be rather verbose and difficult to redirect at times, so that was rather abnormal."  (*Id.* at 75:5-7).  Dr. Ouaou also reiterated that Defendant's learning and recall is challenged.  (*Id.* at 77).  Nevertheless, Dr. Ouaou conceded that Defendant likely "can eventually find an appropriate word he's looking for" and that more time would be helpful for Defendant.  (*Id.* at 77-78).

Dr. Ouaou further testified that if the case were simpler, then his opinion as to Defendant's competency might change. (*Id.* at 79:1-3). Specifically, Dr. Ouaou conceded if the case was just about "one or two big lies," then he believed that Defendant would be able to assist in his own defense. (*Id.* at 79-80). Further, Dr. Ouaou testified that if the lie was that Defendant "was not living in Cape Coral and he was living in Lehigh Acres" or that Defendant "was not married to a certain individual and living with her, when, in fact, the allegation is that he was," then Defendant would probably be able to assist in his defense. (*Id.* at 80). Moreover, Dr. Ouaou testified that it is possible that there would be other "instances where the defendant would be perfectly competent to proceed." (*Id.* at 107:8-10).

Dr. Ouaou conceded that his opinion that Defendant's condition was getting worse was based on Defendant's self-reported medical history. (*Id.* at 88). Additionally, Dr. Ouaou testified that Defendant's medications, such as Benzodiazepine, could have suppressed Defendant's performance on the testing. (*Id.* at 96:1-9). Dr. Ouaou stated that he did not instruct Defendant to stop taking the medication before testing because he thought that it could have made things worse if Defendant was anxious taking the tests. (*Id.* at 96:16-18). Additionally, Dr. Ouaou testified that a history of brain injury or problems with memory are not *ipso facto* indications of legal incompetence. (*Id.* at 104:18-20).

On re-direct examination, Dr. Ouaou testified that there are individuals that are capable of driving "but for various reasons might be incompetent for legal proceedings." (*Id.* at 115:7-10). Additionally, Dr. Ouaou testified that although the tests he administered have up to a 20 percent possibility of error, the chances that Defendant's results fall within that margin of error for all malingering testing are "close to nil." (*Id.* at 118). Thus, Dr. Ouaou reiterated his conclusion that Defendant was not malingering. (*Id.* at 119). Dr. Ouaou also reiterated his

opinion that Defendant's test results were entirely consistent with a diagnosis of traumatic brain injury.  (*See id.* at 125:9-11).  Dr. Ouaou also testified that while Defendant may be competent in other cases where there are less documents, this case clearly falls on the side where he would be incompetent.  (*Id.*).

Dr. Ouaou was also recalled for rebuttal testimony.  (*Id.* at 269).  Dr. Ouaou testified that the presence of a third-party during Dr. Culver's testing raised questions about the validity of her test results.  (*Id.* at 271).

### ii.  *Dr. Culver's Testimony*

Dr. Culver testified second at the competency hearing.  ([Doc. 121 at 140](#)).  Dr. Culver testified about her *curriculum vitae*, including her past educational and work experiences.  (*Id.* at 140-43).  Dr. Culver was accepted by the Court as an expert in psychology.  (*Id.* at 143).

Dr. Culver then discussed the competency evaluation she performed on Mr. Raiola.  (*Id.*).  Dr. Culver testified that Defendant arrived at her office in Fort Myers "parked his vehicle, exited his vehicle, and entered my office building."  (*Id.* at 145:17-18).  Dr. Culver testified that her evaluation lasted four hours.  (*Id.* at 146:6).  Upon arrival, Mr. Raiola completed paperwork and did so in a normal amount of time.  (*Id.* at 146).  Dr. Culver testified that Defendant did not have any issues completing the paperwork.  (*Id.* at 147:10).

Dr. Culver testified that she conducted a forensic interview and administered psychological testing.  (*Id.* at 147-48).  Dr. Culver testified that a postdoctoral resident, Dr. Dawson, observed the interview and introduced Defendant to the psychological testing.  (*Id.*).  Dr. Culver testified that Defendant was a good historian in his interview.  (*Id.* at 152).  Dr. Culver stated that even though Defendant "frequently voiced concerns about his own memory and complained that his memory was poor," Defendant actually "demonstrated to me in his

ability to relay a very detailed autobiographical history was that his memory was actually very good for remote matters, for his own history."  (Doc. 152:5-10).

Moreover, Dr. Culver testified that during her evaluation Defendant was able to remember "information that he had learned only in that evaluation itself," indicating that even within a few minutes, Defendant "was learning things, keeping things across time."  (*Id.* at 152:10-13).  For instance, Dr. Culver testified that Defendant "learned that I was from New York and that was something that we shared in common and that it was something that he joked about and referenced throughout the evaluation."  (*Id.* at 152:17-20).  Additionally, Dr. Culver testified that at one point in the middle of going over his medications list, Defendant indicated that a medication was missing from the list.  (*Id.* at 153:13-15).  Dr. Culver reported that Defendant named the missing medication and then explained what the medication was meant to treat.  (*Id.* at 153:15-16).

Additionally, Dr. Culver noted that, during her evaluation, Defendant asked how long the appointment would last because his wife also had an appointment, which indicated that Defendant has an ability "to sequence and plan and think about the future" and to make judgment calls about the future.  (*Id.* at 153-54).  Dr. Culver testified that Defendant had a "decent enough memory ability in a functional way."  (*Id.* at 154:6-7).

Dr. Culver next testified about the psychological testing.  (*Id.* at 156-57).  Dr. Culver testified that she administered the administered the WMT because she had "some concerns about the authenticity of his clinical presentation."  (*Id.* at 156:14-16).  Specifically, Dr. Culver testified that Defendant's presentation "didn't jive with other objective data that he claimed to have all these deficits" and that it did not line up "with common sense stuff, like the fact he drove there and that he was able to interact and fill out paperwork and do everything else with no

problem and provide a detailed social history, et cetera." (*Id.* at 156:16-22). Dr. Culver reported that Defendant was over-exaggerated taking the WMT, which raised concerns about the validity of Defendant's presentation. (*Id.* at 159:10). Moreover, Dr. Culver testified that Defendant's results were most similar to a group of people hospitalized with severe dementia. (*Id.* at 168-69). Dr. Culver noted, however, that Defendant was not hospitalized nor was Defendant's real life behavior consistent with the results that the test generated. (*Id.*).

Additionally, Dr. Culver testified that she administered the PAI to see if Defendant was presenting as overly virtuous or as exaggerating symptoms. (*Id.* at 157:2-4). The PAI specifically examined the symptoms Defendant reported to "rule out any kind of major psychiatric complaints." (*Id.* at 169:19-21). On this test, Defendant presented as very virtuous person with fewer faults than most people. (*Id.* at 170:1-2).

Dr. Culver testified that Defendant's ability to engage in deductive reasoning and to think hypothetically "were important upper level cognitive abilities that are directly relevant to one's ability to think rationally about their legal case." (*Id.* at 159-60; *see also id.* at 174:1-5).

Moreover, Dr. Culver testified that, in her opinion, Defendant is capable of communicating with his attorney. (*Id.* at 179:22). Dr. Culver testified that Defendant expressed a positive and trusting opinion of his attorney, a rational understanding of his attorney's role, and a willingness to talk to him. (*Id.* at 178:19 – 179:4). Dr. Culver stated that Defendant showed an ability to relate to me in a way that was "meaningful and rational" and that Defendant was "able to tell me things about his case that might be important to his defense." (*Id.* at 179:12-24). Thus, based on her personal interaction with Defendant in the competency evaluation, Dr. Culver opined that Defendant is capable of communicating with his attorney. (*Id.* at 159:19-23).

Dr. Culver further testified that she believed that Defendant is capable of assisting in his own defense in this case.  (*Id.* at 180:3-5).  Specifically, Dr. Culver stated that Defendant "was able to relate on a number of occasions information that might be useful in his defense."  (*Id.* at 180:5-7).  While Dr. Culver noted that Defendant could be tangential at time, she testified that it was relatively easy to get him back on task.  (*Id.* at 183).  Dr. Culver stated that Defendant showed an ability to control his disclosures, suggesting that he would be able to avoid self-incrimination.  (*Id.* at 184:8-10).  Moreover, Dr. Culver testified that she believed Defendant could testify on his own behalf if he chooses to do so because Defendant "was able to talk at length about his case with me, he was able to communicate with me in a coherent fashion, rational, he spoke in complete sentences, [and] his vocabulary is good."  (*Id.* at 185:1-8).  Dr. Culver stated that Defendant is "aware that you want to protect negative things about yourself, you don't just want to openly disclose them."  (*Id.* at 185:8-10).  Thus, while Defendant might not be the most skilled person to testify on his own behalf, Dr. Culver testified that Defendant is not incompetent because he might be tangential or verbose.  (*Id.* at 185:14-15).

Dr. Culver also discussed Dr. Ouaou's testing and results.  (*Id.* at 188).  Dr. Culver testified that she believed her testing procedures were superior to Dr. Ouaou's.  (*Id.*).  Further, Dr. Culver testified that even assuming Dr. Ouaou's test results were valid, she still believed Defendant is competent to proceed.  (*Id.* at 192:10-15).  Dr. Culver reiterated her conclusion from her report that it is possible that Mr. Raiola possesses cognitive defects but that the defects are not so severe as to significantly impair his day-to-day functioning.  (*Id.* at 194:9-13).  For instance, Defendant reported he could cook but that people diagnosed with dementia often struggle with cooking.  (*Id.* at 196:15-18).  Dr. Culver testified that she does not agree with Dr. Ouaou that the amount of discovery and complicated allegations render Defendant unable to

assist in his own Defense.  (*Id.* at 197:11).  Dr. Culver testified that she had no questions regarding Defendant's competence.  (*Id.* at 197:21).

On cross-examination, Dr. Culver testified that she did not do any neuropsychological testing and that Dr. Ouaou has more experience evaluating brain injuries.  (*Id.* at 206-07). Moreover, Dr. Culver testified that she did not dispute the validity of Dr. Ouaou's findings.  (*Id.* at 209:10).  Dr. Culver also conceded that many of her opinions were based on her subjective conclusions.  (*Id.* at 222:2).  Nevertheless, Dr. Culver reiterated her concern that Defendant's functional abilities are not consistent with Defendant's poor test results.  (*Id.* at 209:16-20).  Dr. Culver stated that Defendant was "quick on his feet" and humorous.  (*Id.* at 243-44).  Dr. Culver also testified that humor requires speedy mental processing.  (*Id.* at 245:3).  Dr. Culver testified that "[y]ou can fake being slow, but you can't [fake] being fast."  (*Id.* at 247:17-18).

Later, Dr. Culver conceded that she was not aware that the National Academy of Neuropsychology has an official statement indicating that the presence of third parties during competency evaluations may affect the validity of the test results.  (*Id.* at 214:2-6).

On re-direct examination, Dr. Culver testified that "poor neuropsychological test scores do not *ipso facto* determine if a person is competent."  (*Id.* at 265:6-8).

### C.  Argument by Counsel

#### i.  *Defendant's Counsel*

Defendant's counsel argues that there is no dispute that Defendant has a mental defect such that he is unable to assist in his defense.  (Doc. 122 at 3:11-13).  Counsel argues that it is not enough that Defendant "is oriented as to time and place and has some recollection of the events."  (*Id.* at 4:3-5).  Instead, counsel contends that Defendant also must have a "sufficient

present ability to consult with his lawyer with a reasonable degree of rational understanding" and a "rational, as well as factual understanding of his defense." (*Id.* at 4:6-10).

Counsel argues that there is "objective evidence of traumatic brain injury consistent with brain trauma as a child." (*Id.* at 8:1-3). Counsel further argues that the objective testing showed that Defendant was not malingering. (*Id.* at 8:4-6). Additionally, counsel notes that Defendant has severe learning and memory deficits, scored in the bottom one percentile in processing speed, and that Defendant showed impaired performance on immediate memory. (*Id.* at 8:9-12).

Counsel contends Defendant's diagnosis of major neurocognitive disorder secondary to child traumatic brain injury was unrebutted by Dr. Culver. (*Id.* at 8:7-9). In fact, counsel contends that Dr. Culver "did no objective testing from memory or any other cognitive function" and that Dr. Culver did not dispute the testing by Dr. Ouaou nor the accuracy of his testimony. (*Id.* at 8:13-16). Counsel argues that Defendant has "under-the-hood type problems" for which a simple conversation does not account. (*Id.* at 14-16). Counsel also argues that Defendant's results on the WMT are invalid due to distractions in the interview room. (*Id.* at 20).

Additionally, counsel contends that Dr. Culver's report "simply says that she saw no examples of how the results of that testing would impact on Mr. Raiola's competency to stand trial." (*Id.* at 8:16-19). Counsel argues that Defendant provided sufficient examples of how Mr. Raiola would be impaired. (*Id.* at 8:19). For instance, counsel argues the evidence shows that Defendant does not have the ability to review documents, to follow the testimony at trial, or to testify relevantly. (*Id.* at 9). Counsel also contends that Defendant would struggle to postulate questions to counsel. (*Id.* at 12). Counsel argues that "the deficits that Dr. Ouaou identified are real" and go to the heart of Defendant's ability to defend himself at trial, particularly in a case like this with extensive documentary evidence. (*Id.* at 17-19).

Finally, counsel argues that Dr. Ouaou's qualification as a neuropsychologist is particularly relevant in this case because "his study is detecting defects in the brain and making determinations as to how those deficits impact somebody's ability to function in various contexts." (*Id.* at 53:20-24). Counsel notes that Dr. Ouaou testified that Defendant's deficits are cumulative. (*Id.* at 54:1-2). Thus, counsel argues that Defendant's "admittedly low result on processing" in conjunction with everything else makes Dr. Ouaou's opinion "a collective determination that [Defendant] lacks competence." (*Id.* at 54:4-9).

### ii.   Counsel for the Government

The Government contends that Dr. Culver's testimony demonstrates that Defendant is competent to proceed. (Doc. 122 at 26-27). For example, Dr. Culver testified that Defendant was able to complete introductory paperwork, give a detailed personal history, and discuss possible outcomes of his case. (*Id.* at 27-28). Additionally, the Government argues that Dr. Culver's testing – which showed that Defendant scored closest to individuals hospitalized with dementia – shows that Defendant was answering "in a less than truthful fashion." (*Id.* at 28).

Further, while acknowledging that Dr. Ouaou's objective testing showed that Defendant was not malingering and that Defendant has deficiencies, the Government argues that Dr. Ouaou is not credible. (*Id.* at 29-30). The Government contends that both experts indicated that "bad test results do not *ipso facto* result in incompetence." (*Id.* at 30:14-15). Thus, the Government argues that "test results themselves don't provide that answer. It's the expert's analysis of the test results and extrapolation of those test results that matters." (*Id.* at 31:16-19).

On this point, the Government points out that Dr. Ouaou only opined that Defendant is incompetent in this particular case because there is 15,000 pages of documents and because the case is too complicated. (*Id.* at 31:5-8). The Government notes that "Dr. Ouaou admitted that

his opinion would change if it was just a simple fraud case" and that his opinion would change "if it was a simpler series of allegations." (*Id.* at 31:8-11). The Government points out that "[n]one of that was in [Dr. Ouaou's] report." (*Id.* at 31:11). The Government argues that this omission is important and shows that Dr. Ouaou's opinion is misleading. (*Id.* at 37:11-12). Moreover, the Government contends that Dr. Ouaou's testimony shows that Defendant can be accommodated. (*Id.* at 42:19-20).

Finally, the Government acknowledged that Defendant had poor test results, including an "atrocious" processing speed. (*Id.* at 34:23-25). Nevertheless, the Government argues that "while the defendant may not have performed poorly on the malingering tests, the tests he did the worst on, this processing speed test, is one where the defendant absolutely by all accounts could have controlled his performance on that test." (*Id.* at 35:8-12). The Government argues that Dr. Culver looked at the test results to see if they mattered and she did not see any evidence supporting the poor results in her evaluation. (*Id.* at 36, 37:1-4).

### D.  Analysis

In determining whether Defendant has a mental disease or defect such that he is unable to assist properly in his defense, the Court notes that the competency statute is silent as to which party bears the burden of proof. *See* 18 U.S.C. § 4241(d); *but see United States v. Izquierdo*, 448 F.3d 1269, 1277-78 (11th Cir. 2006) (stating upon review of the defendant's motion to withdraw a guilty plea based on incompetency that "the relevant competency statue arguably contemplates that the burden will lie with the party making a motion to determine competency"). Currently, there is some question regarding where the burden of proving competency to stand trial lies in federal criminal proceedings. *See United States v. Merriweather*, No. 2:07-CR-243-RDP-JEO, 2014 WL 5770213, at *41-42 (N.D. Ala. Nov. 5, 2014) (allocating the burden of proof to the

Government based on an express offer by the Government to assume the burden of proving competency).

Former Fifth Circuit precedent indicates that "[t]here can be no question that in federal criminal cases the government has the burden of proving [a] defendant competent to stand trial at the [competency] hearing." *United States v. Makris*, 535 F.2d 899, 906 (5th Cir. 1976) (upon review of a pre-trial motion to determine competency).[3]  The Eleventh Circuit, however, has subsequently indicated that, despite earlier precedent tending to show the contrary, *see Makris*, 535 F.2d at 905-06, "we have since decided that 'a petitioner raising a substantive claim of incompetency is entitled to no presumption of incompetency and must demonstrate his or her incompetency by a preponderance of the evidence . . . .'" *United States v. Bradley*, 644 F.3d 1213, 1268 (11th Cir. 2011) (citing *Medina v. Singletary*, 59 F.3d 1095, 1106 (11th Cir. 1995)). Additionally, the Supreme Court has indicated, albeit in dicta, that the burden of establishing incompetence rests with the defendant. *Izquierdo*, 448 F.3d at 1277 (citing *Cooper v. Oklahoma*, 517 U.S. 348, 362 (1996) for the proposition that "Congress has directed that the accused in a federal prosecution must prove incompetence by a preponderance of the evidence.").

In the present case, the Undersigned finds that the Eleventh Circuit's *Bradley* decision controls.  *See Bradley*, 644 F.3d at 1268.  *Bradley* specifically addresses and distinguishes the former Fifth Circuit's decision in *Makris* and, thus, appears to abrogate *Makris* by placing the burden of proving incompetence on the defendant.  *See id.*  Thus, the burden of proving incompetence rests with Defendant such that Defendant must prove his incompetency by a preponderance of the evidence.  *See Bradley*, 644 F.3d at 1268; 18 U.S.C. § 4241(d).

---

[3] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit Court of Appeals adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

The preponderance of the evidence standard requires the Court to determine "that the existence of [the] fact is more probable than its nonexistence." *In re Winship*, 397 U.S. 358, 371 (1970). In evaluating the expert evidence and testimony, the Court is free to assign appropriate weight to the expert opinions it receives. *See Battle v. United States*, 419 F.3d 1292, 1299 (11th Cir. 2005). When the Court receives expert opinions with differing conclusions, it does not err "simply by crediting one opinion over another where other record evidence exists to support the conclusion." *Id.* (citing *Johnston v. Singletary*, 162 F.3d 630, 639 (11th Cir. 1998)).

Additionally, the Court notes that "[d]octors must remember that he or she is presenting an informed opinion, not a fact, and they should not be invested in any particular outcome." *United States v. Carter*, No. 1:12-CR-29, 2013 WL 6668715, at *12 (E.D. Tenn. Dec. 18, 2013). Here, the Undersigned concludes that the opinions of both experts are sincerely held within their areas of expertise and that the professional credibility of each expert was not successfully challenged by either party at the hearing.

The Court next evaluates the expertise of the doctors. Based on the testimony at the hearing, Dr. Ouaou was tendered and accepted by the Court as an expert in neuropsychology and clinical psychology. (Doc. 121 at 16:14-15). Dr. Culver was only tendered and accepted as an expert in psychology. (*Id.* at 143). Accordingly, Dr. Ouaou's expertise is given somewhat more weight as it relates to evaluating the effects of brain injuries. Nevertheless, as to the issue of competency, both experts showed an adequate ability to weigh the evidence and render informed opinions according to applicable standards. Thus, the Undersigned does not give either expert more weight as to his or her ability to evaluate Defendant's competency based on expertise alone.

As to the length of the evaluation, courts have given more weight to evaluations conducted over a longer period of time. *See, e.g.*, *Carter*, 2013 WL 6668715, at *3, 13 (according less weight to the evaluation conducted in the shortest amount of time). The Court, however, does not view the length of time spent evaluating a defendant as a simple measuring contest. In *Carter*, for example, the Magistrate Judge afforded one expert less weight based on the amount of time spent evaluating the defendant. *Id.* at 13. In adopting the report and recommendation, however, the District Judge did not simply accept the amount of one-on-one time the experts spent with the defendant as being determinative but, instead, noted that the "opportunity to consider reports from [] staff over a four-month period serves only to strengthen their ability to make an accurate assessment." *Id.* Thus, *Carter* does not stand for the proposition that simply spending more time evaluating a defendant is key but, rather, that the nature and quality of the time spent with a defendant is important. *See id.*

Here, Dr. Ouaou evaluated Defendant for approximately eight hours. (Doc. 121 at 18-19). Dr. Culver evaluated Defendant for four hours. (Doc. 121 at 146:6; Doc. 125 at 2). Upon review, the Undersigned finds that the amount of time spent evaluating Defendant does not weigh in favor of either party. Each expert spent the time he or she thought appropriate to conduct their respective evaluations. There is no indication that the extra time spent by Dr. Ouaou with Defendant was qualitatively better in any respect than the time Dr. Culver spent with Defendant.

Notwithstanding the considerations and findings above, however, the Undersigned finds that the testimony and opinion of Dr. Ouaou are not entirely credible. Specifically, Dr. Ouaou testified that a history of brain injury and bad memory do not *ipso facto* result in incompetence. (Doc. 121 at 104:18-20). Moreover, Dr. Ouaou only opined that Defendant is incompetent in

this particular case because there is an extensive amount of documents (*id.* at 81-82) and because the case is complicated (*id.* at 79:1-3).  Dr. Ouaou conceded that his opinion concerning competence would change if this case was just a simple fraud case or if there were simpler allegations.  (*Id.*).  As the Government pointed out, none of these concessions were set forth in Dr. Ouaou's report.  (Doc. 122 at 31:11).  Dr. Ouaou's failure to address or acknowledge these significant caveats in his report undermines the credibility of his ultimate conclusions.

Moreover, while objective testing administered by Dr. Ouaou showed that Defendant has significant cognitive defects, the Court agrees with the Government that "test results themselves don't provide that answer." (*Id.* at 31:16-17).  Rather, it is "the expert's analysis of the test results and extrapolation of those test results that matters." (*Id.* at 31:17-19).

For example, Dr. Culver testified that Defendant's results on the WMT were most similar to a group of people hospitalized with severe dementia.  (Doc. 121 at 168-69).  Nevertheless, Dr. Culver testified that Defendant was not hospitalized, nor was Defendant's real life behavior consistent with the result that the test generated.  (*Id.*).  Dr. Culver testified that Defendant's presentation "didn't jive with other objective data that he claimed to have all these deficits" and that it did not line up "with common sense stuff, like the fact he drove there and that he was able to interact and fill out paperwork and do everything else with no problem and provide a detailed social history, et cetera." (*Id.* at 156:16-22).

Moreover, Dr. Culver testified that even assuming Dr. Ouaou's test results were valid, she still believed Defendant is competent to proceed.  (*Id.* at 192:10-15).  Dr. Culver specifically pointed to Defendant's ability to cook.  (*Id.* at 196:15-18).  Additionally, Dr. Culver noted that Defendant was "quick on his feet" and humorous.  (*Id.* at 243-44).  Dr. Culver testified that humor requires speedy mental processing (*id.* at 245:3), and that "[y]ou can fake being slow, but

you can't [fake] being fast" (*Id.* at 247:17-18).  Accordingly, even though Dr. Culver conceded that many of her opinions were based on her subjective conclusions (*id.* at 222:2), upon review, the Court finds that Dr. Culver's analysis of the objective results is more credible and, therefore, entitled to greater weight.

Notwithstanding the issues of credibility, the Court notes that Defendant argues "the deficits that Dr. Ouaou identified are real" and go to the heart of his ability to defend himself at trial, particularly in a case like this with extensive documentary evidence.  (Doc. 122 at 17-19).  Defendant specifically argues that his deficits would cause him to struggle with (1) reviewing documents, (2) following the testimony at trial, (3) testifying relevantly, and (4) postulating questions to counsel.  (*Id.* at 9, 12).  The Undersigned finds, however, that the evidence of record contradicts Defendant's alleged inability to assist in his own defense on these grounds.

First, the record demonstrates that Defendant has the ability to review documents.  For instance, both experts testified that Defendant was able to complete new paperwork upon arrival at their offices.  (Doc. 121 at 65-66, 145-47).  Moreover, Dr. Culver testified that in the middle of reviewing his medications list, Defendant indicated that a medication was missing from this list.  (*Id.* at 153:13-15).  On that occasion, Defendant named the missing medication and explained what the medication was meant to treat.  (*Id.* at 153:15-16).  Furthermore, Dr. Ouaou expressly testified that Defendant had the ability to review one or two documents.  (*Id.* at 46:19-21).  Additionally, Dr. Ouaou later testified that if Defendant was given "twenty documents that were the same form that was just submitted on a quarterly basis by the defendant that he filled out every quarter for a certain amount of time," Defendant would "be able to recognize that document when it was referred to in court."  (*Id.* at 121:4-8).  These examples demonstrate that Defendant has an ability to review and recall documents.  Moreover, while this case may be

document intensive, the issue of being able to recall one document from 15,000 pages of documents is an issue *any* defendant could face in a document-intensive proceeding.  Upon review, the Undersigned finds that Defendant has a sufficient ability to review documents to assist in his own defense.

Second, the record demonstrates that Defendant has an adequate ability to follow the proceedings.  The Court notes that Dr. Ouaou's objective testing showed that Defendant has deficits in language, learning, memory, and processing speed.  (Doc. 77 at 8).  Nevertheless, as Dr. Culver explained, Defendant's presentation "didn't jive with other objective data that he claimed to have all these deficits."  (Doc. 121 at 156:16-17).  Dr. Culver specifically noted that Defendant was "quick on his feet" and humorous.  (*Id.* at 243-44).  Dr. Culver testified that humor requires speedy mental processing (*id.* at 245:3), and that "[y]ou can fake being slow, but you can't [fake] being fast" (*id.* at 247:17-18).  Similarly, Dr. Culver testified that Defendant showed an ability to engage in deductive reasoning and to think hypothetically, which are "important upper level cognitive abilities that are directly relevant to one's ability to think rationally about their legal case."  (*Id.* at 159-60; *see also id.* at 174:1-5).  While both experts characterized Defendant as tangential (Doc. 77 at 2; Doc. 125 at 16), Dr. Culver wrote in her report that Defendant "could be fairly easily redirected to the topic at hand" (Doc. 125 at 16).  Similarly, while Dr. Ouaou testified that Defendant "tended to be rather verbose and difficult to redirect at times" (Doc. 121 at 75:5-7), Dr. Ouaou conceded that Defendant likely "can eventually find an appropriate word he's looking for" and that more time would be helpful (*id.* at 77-78).  Accordingly, while Defendant may have some cognitive defects that affect his processing speed, memory, and language skills, the Undersigned finds that the evidence demonstrates that Defendant can adequately follow the proceedings and assist with his defense.

Third, the evidence of record demonstrates that Defendant can testify relevantly.  For instance, Dr. Culver testified that, during her examination, Defendant asked about how long the appointment would last because his wife also had an appointment.  (*Id.* at 153-54).  Dr. Culver opined that this showed Defendant has the ability "to sequence and plan and think about the future" and also to make judgment calls about the future.  (*Id.*).  Dr. Culver further testified that Defendant had a "decent enough memory ability in a functional way."  (*Id.* at 154:6-7).  Dr. Culver specifically wrote that Defendant showed an ability to control his disclosures.  (Doc. 125 at 16).  Additionally, Dr. Culver testified that Defendant "was able to talk at length about his case with me, he was able to communicate with me in a coherent fashion, rational, he spoke in complete sentences, his vocabulary is good."  (Doc. 121 at 185:1-8).  Dr. Culver stated that Defendant is "aware that you want to protect negative things about yourself, you don't just want to openly disclose them."  (*Id.* at 185:8-10).  Additionally, Dr. Culver noted in her report that Defendant's condition is fixed.  (Doc. 125 at 16).  Thus, Dr. Culver's opinion – that the audio recordings from Defendant's prior Social Security hearing showed Defendant has an ability to testify relevantly – also applies to his ability to testify relevantly in the prospective trial in this case.  (*See id.*).  Accordingly, based on the record, the Undersigned finds that Defendant can testify relevantly if he chooses to do so.

Finally, Defendant argues that his deficits impair his ability to postulate questions to counsel.  On this point, the Court notes that minor defects in a defendant's cognitive abilities do not necessarily render a defendant incapable of providing rational assistance to his attorney.  *See United States v. Hogan*, 986 F.2d 1364, 1373 (11th Cir. 1993).  In fact, the Eleventh Circuit has held that "[e]ven perfectly competent defendants often do not fully comprehend the intricacies of some of the defensive theories offered by their lawyers.  That level of comprehension is not a

requirement of competency." *Id.*  Instead, what is required is that a defendant has a rational as well as a factual understanding of the proceedings against him and a sufficient present ability to consult with his attorney with a reasonable degree of rational understanding.  *See id.*

As stated above, the Undersigned finds that Defendant has a rational as well as a factual understanding of the proceedings against him.  To determine whether Defendant has a sufficient present ability to consult with his lawyer, courts have considered various factors such as:

> 1) the state of the defendant's memory, since he should be able to relate pertinent facts, names and events to his attorneys (although the defendant need not remember every fact that trial might encompass); 2) the extent to which relevant evidence could be reconstructed from communications made by the defendant to his counsel or from independent sources; 3) an adequate ability to review and evaluate documents and other written evidence bearing on the case; 4) an appreciation of the Government's evidence against him; 5) the ability to consider the wisdom of taking a course other than standing trial on the merits; 6) the ability to decide objectively whether to exercise his constitutional right to take the stand, and if he does take the stand, the ability to testify in an intelligent, coherent and relevant manner; 7) the ability to remain sufficiently alert and responsive so as to follow and recognize any discrepancies in the testimony of witnesses; and 8) the ability to discuss the testimony with his attorneys and to postulate questions to the witnesses through counsel.

*United States v. Rothman*, No. 08-20895-CR, 2009 WL 426282, at *4 (S.D. Fla. Feb. 19, 2009) (citing *United States v. Passman*, 455 F. Supp. 794 (D.D.C. 1978)).

As explained above, Defendant has an adequate memory, the ability to review documents, the ability to think hypothetically about his case, and the ability to testify relevantly. Additionally, Dr. Culver testified that Defendant expressed a positive and trusting opinion of his attorney, a rational understanding of his attorney's role, and a willingness to talk to him.  (*Id.* at 178:19 – 179:4).  Dr. Culver testified that Defendant was "able to relate to me in a way that was meaningful and rational" and that Defendant could "tell me things about his case that might be important to his defense."  (*Id.* at 179:12-24).  Thus, Dr. Culver testified that Defendant is capable of communicating with his attorney.  (*Id.* at 159:19-23).  Conversely, Dr. Ouaou appears

only to have opined that Defendant does not have the ability to consult with counsel due to his cognitive defects.  (*See* Doc. 77 at 9).  The record evidence does not, however, show that Defendant's cognitive deficits are so profound that they render Defendant incompetent to proceed.  Thus, while Defendant may have some cognitive defects that affect his processing speed, memory, and language skills, the Undersigned finds that the evidence of record demonstrates that Defendant's deficits do not sufficiently impair his present ability to consult with his lawyer with a rational degree of understanding such that Defendant is incompetent to proceed in this case.  *See Hogan*, 986 F.2d at 1373; *see also Rothman*, 2009 WL 426282, at *4.

Upon consideration of the evidence and testimony presented above, although Defendant may have some cognitive deficits, the Undersigned finds that the preponderance of the evidence demonstrates that Defendant does not have a mental disease or defect that renders him unable to assist properly in his defense.  *See* 18 U.S.C. § 4241(d).[4]

## CONCLUSION

Based on the testimony of the experts at the hearing and the information contained in the experts' reports, the Undersigned finds that Defendant is not presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense.  18 U.S.C. § 4241(d).  Accordingly, the Undersigned recommends that Defendant be found competent and that this case should proceed to trial.

---

[4] Even though there may be a question as to who bears the burden, the evidence of competency in this case is not in equipoise.  *See Merriweather*, 2014 WL 5770213, at *42.  Accordingly, the Undersigned finds that allocating the burden to the Defendant does not alter the outcome of the competency determination.  *See id.*

Nevertheless, a finding of competency does not preclude the Court from providing accommodations. In *United States v. Glover*, for example, the Court found that Defendant could be competent to stand trial if questions, terms, and proceedings were explained to him in very simple terms, using concrete examples. 596 F.2d 857, 864-65 (9th Cir. 1979). Similarly, the Court in *Carter* recommended simplifying and slowing down the proceedings and repeating information as needed, allowing ample time for defendant to ask and respond to questions, and allowing breaks for counsel to discuss information and developments with Defendant. 2013 WL 6668715, at *13. In this case, the specific accommodations necessary for Defendant can be addressed with the District Judge at the final pretrial status conference. The Undersigned, however, specifically recommends simplifying and slowing down the trial proceedings, repeating information as needed, allowing ample time for Defendant to ask and respond to questions, allowing frequent breaks for counsel to discuss information and developments with Defendant, frequent redirection of Defendant's attention by Defendant's counsel, and lengthening the proceedings where necessary. *See Glover*, 596 F.2d at 864-65; *Carter*, 2013 WL 6668715, at *13.

Accordingly, **IT IS RESPECTFULLY RECOMMENDED**:

That Defendant be found competent and that this action proceed to trial.

Respectfully recommended in Chambers in Fort Myers, Florida on December 21, 2016.

_____
MAC R. MCCOY
UNITED STATES MAGISTRATE JUDGE

## <u>NOTICE TO PARTIES</u>

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions.  A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation.  *See* 11th Cir. R. 3-1.

Copies furnished to:

Counsel of Record
Unrepresented Parties